**In re Maryetta WILLIAMS, aka Mary Washington, Debtor.**

**Maryetta Williams, Plaintiff,**

**v.**

**BankOne, National Association, Trustee, by its Servicer HomeComings Financial Network, Defendant.**

**Bankruptcy No. 01–35563DWS. Adversary No. 02–0433.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 3, 2003.

**640**

Mary Jeffrey, Philadelphia, PA, for Debtor/Plaintiff.

Joseph Riga, Whittlesly, McDowell and Riga, Maple Shade, NJ, for Defendant.

Edward Sparkman, Philadelphia, PA, Chapter 13 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

---

*OPINION*

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court is the Complaint of debtor/plaintiff, Maryetta Williams ("Debtor"), asserting violations of the Truth in Lending Act (referred to as the "TILA" or the "Act"), 15 U.S.C. § 1601 *et seq.*, against defendant BankOne, National Association Trustee ("BankOne"). At the conclusion of the trial, I took this matter under advisement. Upon consideration, I grant judgment in favor of the Debtor and against BankOne.

**BACKGROUND**

Debtor is a sixty-one year old widow. Prior to the death of her husband, Deleven Williams, she and her husband entered into a loan (the "Loan") secured by a mortgage on their residence located at 3219 W. Dakota Street in Philadelphia, Pennsylvania. Joint Pre–Trial Statement of Maryetta Williams and BankOne, National Association ("Joint Pre–Trial Statement") at Section II, pg. 1; Transcript dated November 19, 2002 ("Transcript") at 4–5. The Loan closing, which occurred on November 13, 1999,[1] lasted approximately an hour and took place at an office on "B" Street in Philadelphia, Pennsylvania. Joint Pre–Trial Statement at Section II, pg. 2; Transcript at 12. Debtor and her husband were picked up at their home and driven to the closing by an employee of the company which originated the Loan, namely Aames Funding Corporation ("Aames"). Joint Pre–Trial Statement at Section II, pg. 1; Transcript at 7–8. The only people in the office at the closing were Debtor, her husband and a woman who acted on behalf of Aames named Ave Craig ("Ms. Craig"). Transcript at 8–9.

Ms. Craig provided Debtor and her husband with the documents to be signed for

---

1. The Loan closing occurred approximately seven months before Mr. William's death. Transcript at 5.

the Loan.[2] Transcript at 10, 12. According to Debtor, she did not read any of the documents because her husband "was taking care of all of it," *id.* at 12, and he did not "totally" read all of the documents either because he did not have enough time. *Id.*

When the closing was over, Debtor's husband was given a file folder containing copies of the Loan documents that were signed which included a Notice of Right to Cancel and a Federal Truth–In–Lending Disclosure Statement ("Disclosure Statement"). Debtor was not given her own folder or separate copies of the documents. *Id.* at 10–11; Exhibit P–1A; Exhibits P–2 & P–7. When they returned home, Debtor's husband put the file folder in a drawer

where it remained until Debtor removed it in order to give it to her counsel in connection with this litigation. *Id.* at 13. Upon review, only one copy of each document was contained in the file folder.[3] Exhibits P–1A & P–1 through P–16.

Both parties agree that Debtor and her husband were entitled to the pre-closing disclosures required by the Homeowner's Equity Protection Act ("HOEPA") amendments to TILA, 15 U.S.C. § 1639. While it appears that the Williamses signed a HOEPA notice on or before the Loan closing,[4] Debtor was not provided with her own copy of the HOEPA notice.

The Disclosure Statement which Debtor signed at the closing for the Loan lists the

---

**2.** At the closing, Ms. Craig advised Debtor and her husband that they did not need to date the Loan documents because she would do that. Transcript at 26, 32. She also advised them not to worry if their names were misspelled in the documents but just to correct the spelling and put their initials next to the correction which both of them did. *Id.* at 33.

**3.** All but one of the documents in the file folder which Debtor's husband received at the November 13 closing that evidence dates by the signature lines are dated "11–13–99;" the handwriting of the dates all looks the same which supports Debtor's testimony that Ms. Craig dated the documents. *Id.*

**4.** One of the factual issues which the parties dispute is whether Debtor signed the HOEPA notice prior to the Loan closing. While Debtor testified that she did not receive or sign any papers regarding the Loan before she went to the closing, Transcript at 10, 31, other evidence in the record suggests that she signed the HOEPA notice on November 9, 1999. For example, Debtor's signature appears on a HOEPA notice with the date of "11–9–99." Exhibit D–1; Transcript at 26. Her husband's signature also appears on the notice and is dated the same but with slashes ("11/9/99") instead of hyphens. *Id.* at 28; Exhibit D–1. Because all of the documents which the Williamses signed at the Loan closing are dated in what appears to be the same handwriting (probably Ms. Craig's handwrit-

ing, *see supra* nn. 2 & 3), the fact that the dates on the HOEPA notice are in different handwritings suggests that the notice was signed on November 9, 1999 as it is dated rather than at the Loan closing on November 13, 1999. In addition, the Williamses' initials appear next to any corrections which they made to the spelling of their names on the documents which they signed at the Loan closing. *See supra* n. 2. In contrast, no initials appear next to the correction of Mr. Williams' name on the HOEPA notice. Again, this distinction suggests that the HOEPA notice was not signed at the same time as the other Loan documents but at some other time. Also supporting this conclusion is the fact that the file folder which Mr. Williams received at the Loan closing does not contain a copy of the HOEPA notice. *See* Exhibit P–1A & P–1 through P–16. Finally, Debtor acknowledged in response to cross-examination, that before her husband's death, he used to take care of the mail and handled the "business in the house." Transcript at 22, 31. Consequently, Debtor's memory of whether her husband received and asked her to sign the HOEPA notice prior to the Loan closing may not be accurate. However, even if Debtor's memory is flawed on this factual issue, a HOEPA violation has occurred since Debtor was not provided with her own copy of the HOEPA notice as the law requires. *See infra* at Section I(B).

"Annual Percentage Rate" as 17.935%, the "Finance Charge" as $75,562.18 and the "Amount Financed" as $17,148.62. Exhibit D–6. It further lists the number of payments for the Loan as 360, the amount of the payments as $257.53 and the beginning date for the payments as 01/01/00. *Id.*

Proceeds of the Loan were disbursed to the City of Philadelphia, PGW and Advantage Credit. *See* Exhibit D–7. The amount disbursed to the latter entity was $36.83.[5] Debtor was unaware of any debt owed to Advantage Credit and did not request that any of the Loan proceeds be disbursed to it. Transcript at 15. However, before her husband's death, he handled the couple's "business in the house" and he was the one who decided "what debts should be paid off" with the Loan *Id.* at 22.

Not long after the Loan closing, Debtor learned that the Loan was sold to a different mortgage company which was BankOne. *Id.* at 14, 35–36, 39; Joint Pre-Trial Statement at Section II, pg. 1 ("The loan was ... assigned to BankOne."). In February of 2000, Homecoming Financial began servicing the Loan on behalf of BankOne. Transcript at 35.

Debtor subsequently defaulted on the Loan. Before the default, nine payments were made on the Loan. *Id.* at 40. Since the Loan payments were $257.53, a total of $2,317.77 ($257.53 × 9 payments) was paid on the Loan.[6] In February, 2001, BankOne commenced a mortgage foreclosure action against Debtor and her husband. Exhibit D–12.

On November 8, 2001, Debtor filed a Voluntary Petition for Bankruptcy under Chapter 13 of the Bankruptcy Code. BankOne subsequently filed a Proof of Claim for a secured claim in the approximate amount of $27,300. Exhibit D–10. The attachment to the Proof of Claim identifies the "current principal balance" of the Loan as $20,027.34. *Id.* Since the original amount of the Loan was $20,150, Debtor's nine payments totaling $2,317.77 paid off only $122.66 of the principal amount of the Loan, Transcript at 54, which means that $2,195.11 of her payments went towards interest.

On or about February 4, 2002, Debtor's counsel forwarded a rescission notice ("Rescission Notice") to BankOne stating that she was rescinding the Loan on behalf of the Debtor pursuant to TILA. Joint Pre-Trial Statement at Section II, pg. 2; Exhibit P–17. Describing the TILA violations, Debtor's counsel stated as follows:

> Please be advised that the notices provided to Ms. Williams do not comply with the TILA because, among other things, they do not state accurately the finance charge, the amount financed or the APR; nor was Ms. Williams given the notice of her rights required by the HOEPA provisions of the TILA.

*Id.*

In the absence of a response to the Rescission Notice, Debtor commenced the instant adversary proceeding against BankOne on March 26, 2002 seeking rescission of the Loan, statutory damages, and attorney's fees and costs. BankOne filed an

---

**5.** The disbursements to the other entities were as follows: (i) $8,525.00 to the City of Philadelphia for water revenue collection; (ii) $6,047.01 to the City of Philadelphia for taxes; and (iii) $1,398.70 to PGW. *See* Exhibit D–7.

**6.** In her post-trial brief, Debtor makes reference to ten payments having been made of

$257.53. *See* Plaintiff's Memorandum of Law in Support of Rescission and Damages ("Debtor's Post–Trial Brief") at 11. However, the testimony at trial was that nine payments were made on the Loan. Debtor offered no explanation in her brief for her calculation of ten payments instead of nine.

answer to Debtor's complaint ("Complaint") and thereafter, seeking to comply with my Pre–Trial Order dated April 30, 2002 ("Pre–Trial Order"), filed a Pre–Trial Statement. *See* Pre–Trial Statement of BankOne, National Association. Doc. No. 10. Subsequently, the parties submitted their Joint Pre–Trial Statement which, except for a few minor changes, mirrors the Pre–Trial Statement which BankOne initially filed on its own. Doc. No. 17. Pursuant to my Pre–Trial Order, the parties' Joint Pre–Trial Statement "supersede[d] all prior pleadings in the case."

At the trial, two witnesses testified, namely Debtor and Anne Sweeney who is an employee of Homecoming Financial. Following the trial, each party submitted a post-trial brief.

## DISCUSSION

 Debtor brings this adversary proceeding against BankOne pursuant to the TILA which is a "a federal statute ... regulat[ing] the terms and conditions of consumer credit." *Horizon Financial, F.A. v. Norris (In re Norris)*, 138 B.R. 467, 470 (E.D.Pa.1992). The purpose of the TILA "is to promote the 'informed use of credit' by consumers." *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) (*quoting* 15 U.S.C. § 1601). Through its enactment of the TILA, Congress sought "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit[.]" 15 U.S.C. § 1601(a). Since the TILA is a remedial statute, it should be construed liberally in favor of the consumer. *Williams v. Empire Funding Corp.*, 109 F.Supp.2d 352, 357 (E.D.Pa. 2000).

In 15 U.S.C. § 1604, Congress authorized the Federal Reserve Board to "prescribe regulations to carry out the purposes" of the TILA. Pursuant to this authority, the Federal Reserve Board promulgated "Regulation Z" which is located in 12 C.F.R. Pt. 226. *Rossman v. Fleet Bank (R.I.) National Association*, 280 F.3d 384, 389 (3d Cir.2002). The Board "also published extensive 'Official Staff Interpretations.' 12 C.F.R. Pt. 226 Supp. I." *Id.* As the Third Circuit noted in *Ortiz v. Rental Management, Inc.*, 65 F.3d 335 (3d Cir.1995), "the Supreme Court has emphasized the broad powers that Congress delegated to the Board to fill gaps in the statute." *Id.* at 339. The Supreme Court has instructed that "[c]ourts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law ... judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." *Ford Motor Credit Company v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). Discussing this same point in *Anderson Bros. Ford v. Valencia, supra*, 452 U.S. at 219, 101 S.Ct. 2266, the Supreme Court stated that "absent some obvious repugnance to the statute," Regulation Z "should be accepted by the courts, as should the Board's interpretation of its own regulation." In analyzing the Debtor's contentions, I shall refer to statutory provisions of TILA as well as to Regulation Z and the Official Staff Interpretations.

Pursuant to § 1635 of the TILA, "in a credit transaction in which a security interest is or will be retained or acquired in property which is the principal dwelling of a consumer, each consumer whose ownership interest is or will be subject to the security interest has a right to rescind the transaction." Robert A. Cook, *A Primer on Closed–End Credit Transactions under*

*the Truth in Lending Act and Regulation Z,* 53 Consumer Fin. L.Q. Rep. 315, 326 (Fall 1999). Since Aames acquired a mortgage on Debtor's residence as security for the Loan, Debtor had the right to rescind the transaction. A consumer who has the right to rescission under the TILA may exercise that right "until midnight of the third business day following consummation of the transaction or the delivery of the information and rescission forms required [under the TILA], whichever is later." [7] 15 U.S.C. § 1635(a). *See also Porter v. Mid–Penn Consumer Discount Co. (In re Porter),* 961 F.2d 1066, 1073 (3d Cir.1992) (explaining that the rescission period extends to three years under TILA when the required notice of the right to rescind and the material disclosures are not delivered).

## I. ASSERTED VIOLATIONS

Debtor cites the following TILA violations in support of her request for rescission and other relief in this proceeding:

(i) she was not provided with two copies of the notice of the right to rescind or a copy of the Disclosure Statement at the Loan closing as required by 15 U.S.C. § 1635(a) and 12 C.F.R. § 226.23(b);

(ii) she was not provided with a copy of the HOEPA notice three days before the

Loan closing as required by 15 U.S.C. § 1639(a) & (b); and

(iii) even if she was provided with the Disclosure Statement, it misstates the finance charge.

BankOne challenges each of these contentions.

### A. Two Copies of the Notice of the Right to Rescind and Copy of the Disclosure Statement

Section 1635(a) of the TILA requires the creditor in a transaction subject to the right to rescission to "clearly and conspicuously disclose, in accordance with the regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor [to rescind]." Section 226.23(b)(1) of Regulation Z more specifically states that any creditor in a transaction subject to the rescission must "deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind." [8] 12 C.F.R. § 226.23(b)(3). Accordingly, under TILA and its implementing regulations, Aames was required to deliver two copies of its Notice of Right to Cancel to Debtor. *Davison v. Bank One Home Loan Services,* 2003 WL 124542, at *3–*4 (D. Kansas January 13, 2003) (concluding that under TILA both husband and wife must each be given two copies of

---

**7.** While not relevant here, the right to rescind expires "three years after the date of consummation of the transaction" even if the information and forms required under the TILA have not been delivered. 15 U.S.C. § 1635(f).

**8.** Appendix H to 12 C.F.R. § 226 provides a model form for the notice of the right to rescind. Captioned " NOTICE OF RIGHT TO CANCEL," it not only explains in plain language the right to cancel a mortgage/lien/security interest on the borrower's home, but how to do so. It advises the borrower who decides to cancel/rescind where to send written notification and that he/she "may use any written statement that is signed and dated by you and states your intention to cancel, *or you*

*may use this notice by dating and signing below."* It concludes with the following provision:

I WISH TO CANCEL

_____ _____
Consumer's Signature Date

12 C.F.R. Part 226, Appendix H, Form H–8 (emphasis added). Pursuant to 12 C.F.R. § 226.23(b)(2), a creditor must use the model form or a "substantially similar notice" to "satisfy the disclosure requirements" of 12 C.F.R. § 226.23(b)(1). The Notice of Right to Cancel which Debtor and her husband signed at the Loan closing tracks the model form.

the notice of the right to rescind); *Hanlin v. Ohio Builders and Remodelers, Inc.,* 212 F.Supp.2d 752, 759 (S.D.Ohio 2002) ("a lender is required to deliver two copies of the notice of right to rescind[.]"); *Stone v. Mehlberg,* 728 F.Supp. 1341, 1347 (W.D.Mich.1990) (noting that TILA was violated because husband and wife should have each been provided with two copies of the notice of the right to rescind). In *Stone v. Mehlberg, supra,* the court explained the purpose of providing two copies of the notice of the right to rescind to each consumer, stating:

> TILA's requirement of two rescission notice copies to each obligor is not a mere technicality. Effective exercise of the right to rescind obviously depends upon the delivery of one copy of the rescission form to the creditor and the retention by the obligor of the other copy. Just as obviously, each person whose home ownership interest may be compromised by a credit transaction must be informed of his or her rescission rights. The fact that joint obligors may be husband and wife is irrelevant. Spouses are no more interchangeable under TILA's rescission provisions than any other group of persons.

*Id.* at 1353. Under 12 C.F.R. § 226.17(d), Aames was also required to provide Debtor with a copy of the Disclosure Statement. *Davison v. Bank One Home Loan Services, supra,* 2003 WL 124542, at *4 ("In addition to the right to rescind form, lenders must deliver to each borrower one copy of the TILA disclosure form.").

BankOne does not dispute the aforementioned TILA requirements but argues that Debtor's contention that she was not given two copies of the Notice of Right to Cancel and a copy of the Disclosure Statement at the Loan closing are raised "too late" in this proceeding and "should not be considered." Post Trial Brief of Defendant, BankOne, National Association ("BankOne's Post–Trial Brief") at 2–3, 5. BankOne points out that Debtor's Rescission Notice, while specifically mentioning that Debtor did not receive a HOEPA notice, did not make any reference to Debtor not having received copies of the Notice of Right to Cancel. Similarly, Debtor made no mention in her Complaint of not having received copies of the Notice of Right to Cancel. With regard to the Disclosure Statement, BankOne asserts that in both the Rescission Notice and the Complaint, Debtor affirmatively acknowledged having received the Disclosure Statement and complained only of its content.

While BankOne is correct that neither the Rescission Notice nor the Complaint mention Debtor's contention that she was not given copies of the Notice of Right to Cancel and that the Rescission Notice and the Complaint affirmatively indicate that she did receive the Disclosure Statement, I am nevertheless unpersuaded by its waiver argument.[9]

In the Rescission Notice, Debtor specifically stated that "the notices provided to Ms. Williams do not comply with the TILA because, *among other things,* they do not state accurately the finance charge, the amount financed or the APR; nor was Ms. Williams given the notice of her rights required by the HOEPA provisions of the TILA." Exhibit P–17 (italics added). Thus, while the Rescission Notice identifies several defects in the lender's compli-

---

9. Even if I was persuaded by BankOne's argument that Debtor was bound by the allegations in her Complaint that she received a copy of the Disclosure Statement, that conclusion would not alter the outcome of this adversary proceeding since I find in favor of the Debtor on her assertions that Aames failed to provide her with two copies of the Notice of Right to Cancel and a copy of the pre-closing HOEPA notice.

ance with TILA, it does not purport to list them all. Moreover, BankOne has failed to cite any authority for the proposition that a consumer is limited when pursuing a suit for rescission to the TILA violations to which he or she referred in her notice of rescission. Furthermore, I am unaware of any provision in TILA or Regulation Z (and BankOne has not cited to any) which requires a consumer to identify the TILA violations upon which his or her request for rescission is being made.[10] *See Aquino v. Public Finance Consumer Discount Company*, 606 F.Supp. 504, 507–08 (E.D.Pa.1985) (observing that 15 U.S.C.

§ 1635(a) and Regulation Z only require the customer to notify the creditor of her intention to rescind and do not require her to identify the disclosure violation at issue).

▮ Insofar as the allegations which the Debtor made in her Complaint, the parties' Joint Pre–Trial Statement "supersed[ed] all prior pleadings in the case." While BankOne could have sought to have the Complaint admitted into evidence at the trial, it did not do so. Consequently, the averments in Debtor's Complaint are not part of the evidence in the record before me.[11] *See Lemelman v. Brown (In*

**10.** Significantly, the Notice of Right To Cancel form which Aames used in conjunction with the Loan instructs the borrowers that the transaction can be cancelled by signing and dating the form in the space indicated and timely delivering the form to the address listed thereon. *See* Exhibit D–5. The form does not require or provide any space for the borrowers to list the reasons for cancelling the transaction.

**11.** In its post-trial brief, BankOne also argues that the doctrine of judicial estoppel should be applied to prevent Debtor from contradicting the earlier position which she took in her Complaint that she was given a copy of a disclosure statement (albeit an inaccurate one) at the closing. *See* BankOne's Post–Trial Brief at 5. However, judicial estoppel is inapplicable in such circumstances. As the district court explained in *Decker v. Vermont Educational Television, Inc.*, 13 F.Supp.2d 569 (D.Vt.1998):

The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by her in a prior legal proceeding. *Bates v. Long Island, R.R.*, 997 F.2d 1028, 1037 (2d Cir.1993). Judicial estoppel does not apply unless the party "advanced a clearly inconsistent position in a prior proceeding and that inconsistent position was adopted by the court in some manner." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir.1997). Rationales behind the doctrine include protecting judicial integrity by precluding the risk of inconsistent *results* in separate legal proceed-

ings, and preserving the sanctity of the oath. *Bates*, 997 F.2d at 1037, *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir.1997) (emphasis added).

*Id.* at 573. Since BankOne contends that Debtor is contradicting a legal position taken earlier in the *same* litigation, judicial estoppel is inapplicable.

Notably, BankOne did not assert at trial, and has not argued in its post-trial brief, that the allegation in the Complaint that Debtor was given a disclosure statement is a judicial admission that is conclusively binding on Debtor. *See Schott Motorcycle Supply, Inc. v. American Honda Motor Company*, 976 F.2d 58, 61 (1st Cir.1992) (*quoting Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*, 757 F.2d 523, 528 (2d Cir.1985)) (" 'A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.' "). However, even if BankOne had raised this argument, I conclude that there was no judicial admission that foreclosed Debtor's contentions at trial. As I noted above, the parties' pleadings were superseded by the Joint Pretrial Statement. Therefore, Debtor's allegation in her Complaint that she was given a disclosure statement would constitute only an evidentiary admission and not a judicial admission. *See White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 n. 5 (5th Cir.1983) ("Admissions made in superseded pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions."); *Holland v. Fahnestock & Co., Inc.*, 2002 WL 1774230, at *7 n. 7 (S.D.N.Y. August 1, 2002) ("superseded pleadings, while

*re S.N. Brown Electrical Corporation)*, 136 B.R. 598, 601 (Bankr.D.Mass.1992) ("Allegations in pleadings are not evidence."); *Pinder v. The Lomas & Nettleton Company (In re Pinder)*, 83 B.R. 905, 912 (Bankr.E.D.Pa.1988) (ruling, in adversary proceeding based on the TILA that "allegations in the pleadings are not evidence before this Court.").

Furthermore, the Joint Pre–Trial Statement closely mirrors the original Pre–Trial Statement filed solely by BankOne which means that its counsel drafted the vast majority of the language in the Joint Pre–Trial Statement. Yet, BankOne's counsel included no mention in the Statement of Uncontested Facts about Debtor having received copies of the notice of the right to rescind or a copy of the Disclosure Statement.[12] In addition, the *sole* sentence in the Statement of Facts in Dispute is that "[Debtor] received all notices required by TILA, including the HOEPA notice, in a timely fashion."[13] As phrased, this statement of disputed facts clearly leaves room for Debtor's argument that she did not receive other notices required under TILA besides the HOEPA notice. Moreover, the first question stated in the section on "Legal Issues Presented" is whether "[Debtor] receive[d] all required TILA No-

tices (mixed question of law and fact)."[14] BankOne could have precisely drafted this issue to refer solely to the HOEPA notice. Instead, it drafted the issue in a broad, general fashion, referring to "all required TILA Notices." As drafted, the issue leaves ample room for Debtor's argument that she did not receive two copies of the Notice of Right to Cancel or a copy of both the Disclosure Statement and the HOEPA notice. Consequently, I reject BankOne's argument that Debtor should be barred from pressing her contentions regarding her receipt of the Notice of Right to Cancel and Disclosure Statement.

BankOne also asserts that Debtor has failed to carry her burden of proving that two copies of the notice of the right to rescind were not provided to her at the Loan closing. *See* BankOne Post–Trial Brief at 4. In support of this assertion, BankOne cites to 15 U.S.C. § 1635(c) which provides:

> Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section does not more than create a rebuttable presumption of delivery thereof.

admissible in evidence, do not constitute judicial admissions."), *report and recommendations adopted by* 210 F.R.D. 487 (S.D.N.Y. 2002); *Ganz v. Lyons Partnership, L.P.*, 961 F.Supp. 981, 988 (N.D.Tex.1997) ("holding that since pretrial order superseded prior pleadings, statements taken from plaintiff's pleadings were not judicial admissions but only adverse evidentiary admissions."). *See also Katz v. Cohn*, 900 F.2d 262, 1990 WL 47493, at *1 (9th Cir. April 17, 1990) (unpublished decision but text available on Westlaw) ("[T]here are no conclusive judicial admissions in the complaint since it was amended by the joint pretrial statement.").

12. The Statement of Uncontested Facts provides that "[Debtor] received copies of loan

documents at the closing" but does not identify which documents she received. *See* Joint Pre–Trial Statement at 2. The same statement was made in the Pre–Trial Statement which BankOne originally filed.

13. In the Pre–Trial Statement which BankOne originally filed, the Statement of Facts in Dispute stated: "Plaintiff received all notices required by TILA including the HOEPA notice."

14. The first question in the section entitled "Legal Issues Presented" was the same in the BankOne's original Pre–Trial Statement and the Joint Pre–Trial Statement submitted by both parties.

15 U.S.C. § 1635(c). Pursuant to this provision, Debtor's signature on the Notice of Right to Cancel (a copy of which was included in the folder given to her husband at the Loan closing) acknowledging that she received two copies of the notice "does no more than create a rebuttable presumption" that she received them. The evidence in this case, as detailed below, is sufficient to overcome that presumption.

Debtor credibly testified that her husband was given the file folder with copies of the Loan documents in it but that she was not given any folder or any documents of her own. She further testified that, upon their return home, the file folder was put in a drawer where it remained until she retrieved it to provide it to her attorney. The file folder contains only one copy of the Notice of Right to Cancel. Thus, I conclude, based on the evidence in the record, that Aames failed to provide Debtor herself with any copy of a notice of the right to rescind, let alone the two copies that were required.[15] *See Jenkins v. Landmark Mortgage Corporation*, 696 F.Supp. 1089, 1093 (W.D.Va.1988) (rebuttable presumption of receipt that was created by acknowledgment of receipt of TILA disclosure statement was rebutted by "testimony that plaintiff left the attorney's office without the TILA disclosure form and did not actually receive it in the form she could keep until [later].").

BankOne also argues that Debtor failed to prove that Aames did not provide her with a copy of the Disclosure Statement. Again, I respectfully disagree. While Debtor's signature appears on the Disclosure Statement indicating that she received a copy of it, her testimony (*i.e.*, that husband was provided with a file folder containing copies of the Loan documents but that she was not provided with copies of any of the Loan documents) was to the contrary. Since I find Debtor's testimony to be credible, I am persuaded that Aames failed to provide her with a copy of the Disclosure Statement as it was required to do under TILA.

### B. *The HOEPA Notice*

■ Congress enacted the HOEPA amendments to the TILA because "the type of disclosures required under TILA were insufficient to ensure adequate notification to the consumer of the financial ramifications of high cost, nonpurchase money mortgages." *Newton v. United Companies Financial Corp.*, 24 F.Supp.2d 444, 450 (E.D.Pa.1998). As the district court in *Williams v. Gelt Financial Corporation*, 237 B.R. 590, 594 (E.D.Pa.1999) (*quoting* S.Rep. No. 103–169, at 21 (1993)), explained: "HOEPA was designed to address the problem of 'reverse redlining,' that is, the targeting of persons for 'credit on unfair terms' based on their income, race or ethnicity." To remedy this problem, "HOEPA sets forth substantive prohibitions and notice requirements for a defined class of non-purchase, non-construction, closed-end loans with high interest rates or up front fees as High Cost Mortgages." *Newton v. United Companies Financial Corp., supra*, 24 F.Supp.2d at 455. *See also Williams v. Gelt Financial Corporation, supra*, 237 B.R. at 594 (*quoting* S.Rep. No. 103–169, at 21 (1993)) ("[The HOEPA legislation] requires creditors making High Cost Mortgages to provide a special, streamlined High Cost Mortgage disclosure three days before consummation of the transaction ... [and] prohibits High Cost

---

**15.** Indeed, since the file folder contains only one copy of the Notice of Right to Cancel, even if the file folder was given to Debtor rather than her husband, Aames still failed to comply with its obligation to provide Debtor with two copies of the notice of the right to rescind.

Mortgages from including certain terms such as prepayment penalties and balloon payments that have proven particularly problematic.").

When a mortgage fits within the requirements of 15 U.S.C. § 1602(aa), HOEPA requires a creditor to deliver certain pre-closing disclosures at least three business days prior to the loan closing. *Newton v. United Companies Financial Corp., supra,* 24 F.Supp.2d at 451;15 U.S.C. § 1639(a)-(b); Subpart E of Regulation Z, 12 C.F.R. §§ 226.31—226.32. These pre-closing disclosures are referred to as "pre-closing HOEPA disclosures" or "Section 32 disclosures." *See Hanlin v. Ohio Builders and Remodelers,* 212 F.Supp.2d 752, 761 (S.D.Ohio 2002) ("section 23 disclosures"); *Jackson v. U.S. Bank National Association Trustee (In re Jackson),* 245 B.R. 23, 30 (Bankr.E.D.Pa. 2000); ("pre-closing HOEPA disclosures"). *See also* Christian T. Jones, *New Truth In Lending Rules—Section 32 Credit Requirements,* 48 Consumer Finance Quarterly Law Report 442, 445 (1994) ("Section 32 disclosures").[16] A failure to provide the pre-closing HOEPA disclosures constitutes a material violation of TILA entitling the borrower or obligor to rescission. *Jackson, supra,* 245 B.R. at 32 (holding that the failure to provide pre-closing disclosures as required by HOEPA constitutes "a material violation of the TILA, *see* 15 U.S.C. §§ 1602(u), 1639(a), 12 C.F.R. § 226.23(a)(3) n. 48, entitling the [d]ebtor to rescission of the transaction.").

As noted above, the parties agree that "under the terms of the loan in question," Debtor was entitled to the pre-closing HOEPA disclosures. BankOne contends that Aames provided these disclosures to Debtor because it delivered the HOEPA notice to the Williamses three business days prior to the Loan Closing. However, even assuming this fact is true, *see supra* n. 4, Regulation Z specifically requires creditors to provide the pre-closing HOEPA disclosures or the HOEPA notice "in a form that the consumer may keep" to "*each* consumer who has the right to rescind." 12 C.F.R. § 226.31(b) & (e) (italics added); *see also* 12 C.F.R. § 226.23(a)(3) & n. 48.

The Official Staff Commentary to 12 C.F.R. § 226.23(b) explains that each consumer who is entitled to rescind must be given two copies of the rescission notice and the material disclosures. The term "material disclosures" is defined in 12 C.F.R. § 226.23 to include the pre-closing HOEPA disclosures mandated by 15 U.S.C. § 1639(a) and 12 C.F.R. § 226.32(c) and (d). 12 C.F.R. § 226.23(a)(3) n. 48. *See also* 15 U.S.C. § 1602(u) (defining "material disclosures" under TILA to include "the disclosures required by section 1639(a) of this title."). The Official Staff Commentary to § 226.23(b) elaborates on this point, stating in pertinent part:

> In a transaction involving joint owners, both of whom are entitled to rescind, both must receive the notice of the right to rescind and disclosures. **For example, if both spouses are entitled to rescind a transaction, each must receive 2 copies of the rescission notice and one copy of the disclosures.** If e-mail is used, the creditor complies with § 226.23(b)(1) if one notice is sent to each co-owner. Each co-owner must consent to receive electronic disclosures and each must designate an electronic address for receiving the disclosure.

---

**16.** The term "Section 32 disclosures" is based on the fact that the requirements for such transactions are contained in § 226.32 of Regulation Z. *See New Truth In Lending Rules—Section 32 Credit Requirements, supra,* 48 Consumer Finance Quarterly Law Report at 442.

Official Staff Commentary to 12 C.F.R. § 226.23(b)(12 C.F.R. Pt. 226, Supp. I) (emphasis added).

Since Debtor was a consumer with the right to rescind, Aames was required, contrary to its contentions, *see* BankOne's Post–Trial Brief at 8 (disputing Debtor's argument that both spouses must receive their own copy of the HOEPA notice),[17] to provide Debtor with her a copy of the HOEPA notice which she could keep. *See* Robert A. Cook, *A Primer on Closed–End Credit Transactions under the Truth in Lending Act and Regulation Z, supra*, 53 Consumer Fin. L.Q. Rep. at 318 (explaining that "consumers must be furnished with the disclosures in written form that the consumer may keep" and that in rescindable transactions, "each consumer who has the right to rescind must receive the 'material disclosures' and the disclosures required for Section 32 loans[.]"). There is no evidence in the record, and BankOne has not even argued,[18] that Aames provided each of the Williamses with a copy of the HOEPA notice.[19]

**17.** The Notice of Right to Cancel which the Williamses signed in conjunction with the closing states that "WE THE UNDER-SIGNED *EACH* RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL ...," Exhibit P–7 (italics added), whereas the HOEPA notice which they signed states only that "The undersigned hereby acknowledges receipt of a copy of this notice," Exhibit D–1.

**18.** In its trial brief, Bank One stated: "Aames Funding delivered a HOEPA notice to the Williamses three business days prior to the Loan closing[.]" Trial Brief of Defendant, BankOne, National Association at 9.

**19.** Citing to 15 U.S.C. § 1641(b), BankOne also argues that Debtor's signature on the HOEPA notice constitutes conclusive proof of delivery of the document to her. Section 1641 provides, in pertinent part:

Except as provided in section 1635(c) of this title, in any action or proceeding by or against any subsequent assignee of the original creditor without knowledge to the contrary by the assignee when he acquires the obligation, written acknowledgment of receipt by a person to whom a statement is required to be given pursuant to this subchapter shall be conclusive proof of the delivery thereof[.]

15 U.S.C. § 1641(b). As the first phrase in this provision indicates, the conclusive presumption created by § 1641 does not apply when § 1635(c) is applicable. As noted above, § 1635(c) states, in pertinent part: "Written acknowledgment of receipt of any disclosures required under this subchapter [referring to Subchapter I of Title 41 of the Code] by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1635(c). The HOEPA notice is a: (I) disclosure required under Subchapter I of Title 41 of the Code; and (ii) a statement containing material disclosures required to be given under § 1635, *see* 15 U.S.C. § 1602(u) (defining the term "material disclosures" to include the "disclosures required by section 1639(a) of TILA"). Consequently, the conclusive presumption of § 1641(b) is inapplicable here and the rebuttable presumption created by § 1635(c) applies. *See Bryant v. Mortgage Capital Corporation*, 197 F.Supp.2d 1357, 1362–1363 (N.D.Ga.2002) (holding that "in cases involving a rescindable transaction," a signed acknowledgment "confirming the delivery of required disclosures under TILA" does not "constitute 'conclusive proof' of compliance with the act as provided in section 1641(b)" but "merely creates a 'rebuttable presumption' as provided in section 1635(c)."). *See also* 35A Mass. Prac. Consumer Law § 14:51 n. 2 (2d ed) ("In rescindable transactions, a consumer's written acknowledgment of receipt of disclosures creates only a rebuttable presumption of delivery. 15 U.S.C. § 1635(c)[.]"); 28 Tex. Prac. Consumer Rights and Remedies § 12.9 (3d ed.) (observing that the "conclusive proof of delivery" defense available to certain assignees under 15 U.S.C. § 1641(b) is not applicable to "transactions subject to the right of rescision."). Based on the evidence in the record, Debtor has rebutted any presumption that she received her own HOEPA notice.

## C. *Accuracy of the Finance Charge Listed on the Disclosure Statement*

 Debtor also argues that, even if she was provided with the Disclosure Statement, she is entitled to rescind the Loan transaction because the Disclosure Statement understates the finance charge by $183.33. Debtor's Post–Trial Brief at 8–9. Citing 15 U.S.C. § 1635(i)(2), Debtor asserts that "because of the foreclosure process, the defendant is allowed a tolerance of $35.00 for discrepancies in the finance charge." *Id.* at 8. Section 1635(i)(2) states, in relevant part:

> [F]or the purposes of exercising any rescission rights after the initiation of any judicial or nonjudicial foreclosure process on the principal dwelling of the obligor securing an extension of credit, the disclosure of the finance charge and other disclosures affected by any finance charge shall be treated as being accurate for purposes of this section if the amount disclosed as the finance charge does not vary from the actual finance charge by more than $35 or is greater than the amount required to be disclosed under this subchapter.

15 U.S.C. § 1635(i)(2).

Debtor's position that the finance charge on the Disclosure Statement was understated by $183.33 is based on her view that the actual "Amount Financed" on the Loan is $16,965.29. Subtracting the aforementioned amount from $17,148.62 which is the amount listed on the Disclosure Statement for the "Amount Financed" leaves a difference of $183.33. Debtor reasons that since the "Amount Financed" was overstated by $183.33, the finance charge was understated by this amount or, in other words, the amount listed for the finance charge on the Disclosure Statement should have been $183.33 more.

In computing the "Amount Financed" as $16,965.29, Debtor includes the following amounts:

| | |
|---|---|
| $ 8,525.08 | –disbursed to the City of Philadelphia for Water Revenue Collection |
| 6,047.01 | –disbursed to City of Philadelphia for taxes |
| 1,398.70 | –disbursed to Philadelphia Gas Works |
| 280.00 | –disbursed to the Williamses |
| 225.00 | –charge for appraisal |
| 32.00 | –charge for recording fee |
| 118.50 | –title insurance premium |
| 339.00 | –charge for hazard insurance |
| $16,965.29 | |

*Id.*

BankOne disputes Debtor's calculation of the "Amount Financed" and, consequently, her determination of the finance charge. In BankOne's view, the "Amount Financed" on the Loan was actually $17,458.62 which is $310 more than the amount listed in the Disclosure Statement. Since the "Amount Financed" was understated, BankOne asserts, the finance charge was overstated on the Disclosure Statement. BankOne points out that such a discrepancy in the finance charge is not actionable since under § 1635(i)(2), which Debtor cited, "the disclosure of the finance charge" is "treated as accurate" so long as "the amount disclosed as the finance charge . . . is greater than the amount required to be disclosed[.]" 15 U.S.C. § 1635(i)(2).

BankOne's position that the "Amount Financed" was $17,458.62 and not $16,965.29 as Debtor argues, is based on its assertion that the following amounts are also part of the "Amount Financed": (i) $36.83 for the disbursement to Advantage Credit; (ii) $35.00 for notary fees; and (iii) an additional $271.50 for title insurance and $150.00 for endorsements to the same. For the reasons set forth below, I agree with this analysis and, therefore, reject Debtor's contention that, under the tolerance level set forth in § 1635(i)(2),

the finance charge listed on the Disclosure Statement was not accurate.

### (i) *$36.83 Disbursement to Advantage Credit*

Debtor contends that the disbursement of $36.83 to Advantage Credit should not be included in the amount financed because "there is no explanation for the charge and [Debtor] testified she was unaware of what [the] charge was for." Debtor's Post–Trial Brief at 9. However, Debtor's testimony at trial revealed that, prior to his death, Mr. Williams handled the finances for their home and that he was the one who decided "what debts should be paid off." Consequently, the fact that Debtor was unaware of the reason for the disbursement to Advantage Credit, by itself, does not convince me that the disbursement was not made on the Williams' behalf and at their request.

### (ii) *$35.00 Notary Fee*

Debtor fails to mention the $35.00 notary fee in her brief. Pursuant to § 226.4 of Regulation Z, notary fees do not constitute finance charges "in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount." 12 C.F.R. § 226.4(c)(7)(iii). There is nothing in the record to suggest that the notary fees listed on the Settlement Statement, *see* Exhibits P–1 & D–7 (both exhibits are copies of the same document), were not "bona fide" and "reasonable in amount."

### (iii) *Additional $271.50 for Title Insurance and $150.00 for Endorsements to the Same*

According to the Settlement Statement submitted to Debtor and her husband in connection with the Loan, Chestnut Abstract Company was paid a total of $615.00 including: (i) $35 for a notary fee; (ii) $20 for a wire fee; (iii) $20 for an overnight courier; (iv) $390 for abstract or title search, title examination, title insurance binder and title insurance; and (v) $150 for endorsements to the title insurance. *See* Exhibits P–1 & D–7. BankOne contends that the $390 paid for abstract or title search, title examination, title insurance binder and title insurance as well as the $150 for endorsements to the title insurance should be included in the Amount Financed and not in the finance charge. Section 226.4(b)(7)(i) of Regulation Z provides that "fees in a transaction secured by real property or in an residential mortgage transaction" for "title examination, abstract of title, title insurance property survey, and similar purposes" are *not* finance charges if "the fees are bona fide and reasonable in amount." 12 C.F.R. § 226.4(b)(7)(i).

In her post-trial brief, Debtor contends that only $118.50 of the $540 ($390 + $150 = $540) can be included in the Amount Financed and that the rest must be included in the finance charge because the Ledger Sheet for the Loan shows that only $118.50 was paid to Chestnut Abstract Company for "premium remittance." *See* Exhibit P–18. However, a review of the Ledger Sheet indicates that, in addition to the check for $118.50, another check was issued to Chestnut Abstract Company for $496.50. Adding this amount to $118.50 equals $615 which, based on the Settlement Statement, is the total amount paid to Chestnut Abstract Company. While the "memo" notation on the Ledger Sheet for this additional check states "payroll account" rather than "premium remittance" (as the "memo" notation for the $118.50 check states), I reject Debtor's contention that this fact alone proves that only $118.50 was paid to Chestnut Abstract Company for title insurance. Significantly, Debtor did not raise this argument at trial. Indeed, during closing arguments at trial, her counsel agreed that the $390 for title insurance plus the $150 for endorse-

ments were *included* in the Amount Financed. Transcript at 84. Consequently, BankOne was not put on notice during the trial that Debtor disputed the $540 for title insurance and endorsements and, therefore, never offered any evidence to rebut this point. I, therefore, conclude that on this record the aforementioned $540 should be included in the Amount Financed and not the finance charge.

## II. RELIEF FOR VIOLATIONS

Since Aames violated TILA by failing to provide Debtor with two copies of the notice of the right to rescind, a copy of the Disclosure Statement and a copy of the pre-closing HOEPA disclosures, Debtor was entitled to rescind the Loan transaction pursuant to 15 U.S.C. § 1635(a). The parties disagree on how the remedy of rescission should be applied here. In addition, Debtor argues that she is entitled to statutory damages for the TILA and HOEPA violations as well as for BankOne's failure to act on her rescission notice. She also requests an award of attorney's fees and costs.

### A. *Rescission*

Section 1635(a) of TILA creates the right of rescission; section 1635(b) explains the effect that rescission has on the parties when the right is exercised. Section 1635(b) provides:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b).[20] Based on this provision, Debtor contends that: (i) BankOne's security interest in her residence should be declared void; and (ii) BankOne

---

**20.** Summarizing in succinct fashion the obligations imposed by this provision, the district court in *Celona v. Equitable National Bank,* 98 B.R. 705 (E.D.Pa.1989), stated:

> [W]hen an obligor exercises his right to rescission, he is not liable for any finance or other charge and any security interest given by the obligor becomes void upon the rescission. 15 U.S.C. § 1635(b). Upon receipt of the rescission notice the creditor must return any down payment or other

> monies it received from the obligor and take the steps necessary to reflect the termination of the security interest. Thereafter, the obligor is to return to the creditor the property he received or its reasonable value. If the creditor does not take possession of the property within twenty days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.

> *Id.* at 707.

should be ordered to return $6,437.68 to her since she was charged $3,862.38 in settlement costs and paid $2,575.30 in monthly installments for the Loan. In addition, focusing on the fourth sentence in § 1635(b) (which is "Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if the return of the property in kind would be impractical or inequitable, the obligor shall tender its reasonable value."), Debtor further argues that because BankOne did not comply with its obligations under § 1635(b), she should be relieved of her "tender obligation" under § 1635(b). *See* Debtor's Post–Trial Brief at 10. In contrast, BankOne asserts, based on the last sentence in § 1635(b) which permits a court to modify the procedures set forth therein, that in order to ensure that Debtor complies with her tender obligation, rescission should be conditioned upon her payment of the remaining principal amount due on the Loan.

■ The only issue which the parties do not debate is the effect which rescission has on Debtor's obligation to pay "any finance or other charge" on the Loan. Based on the language in § 1635(b), Debtor is relieved, as a result of her rescission of the Loan transaction, from: (i) repaying the $3,862.38 in settlement charges that she incurred for the Loan; and (ii) from paying interest on the Loan. *See Semar v. Platte Valley Federal Savings & Loan Association,* 791 F.2d 699, 703 & 705 (9th Cir.1986) (holding that a borrower in a TILA rescission is not obligated to repay the settlement charges on the loan or any interest because "[i]nterest is a finance charge."). Accordingly, the principal

amount Debtor owes on the Loan (barring any set-offs or reductions which will be discussed below) consists of the $16,007.62 which was disbursed to third parties [21] and the $280 that was disbursed to Debtor from the Loan proceeds for a total of $16,287.62.

All of the other issues which § 1635(b) raises regarding the effect of Debtor's rescission of the Loan are in dispute. In view of the parties' arguments, I must decide the following: (i) whether BankOne's failure to comply with its obligations under § 1635 relieves Debtor of her tender obligation; (ii) if not, whether rescission should be conditioned upon Debtor's fulfillment of her tender obligation; and (iii) whether BankOne is obligated under § 1635(b) to return any money to the Debtor.

(i) *Whether BankOne's Failure to Comply With its Obligations under § 1635(b) Relieves Debtor of her Tender Obligation*

■ According to § 1635(b), BankOne had twenty days after its receipt of Debtor's Rescission Notice to return to the Debtor "any money or property given as earnest money, downpayment, or otherwise" and to "take any action necessary or appropriate to reflect the termination" of the lien created on Debtor's residence under the Loan transaction. *See* 15 U.S.C. § 1635(b). Putting aside for the moment the issue of whether BankOne had an obligation to return any money to Debtor (which I discuss below), it is undisputed that BankOne failed to take action to reflect the termination of the mortgage on Debtor's residence. Consequently, Debtor correctly asserts that BankOne did not fulfill its obligations under § 1635(b).

---

**21.** As noted above, *see supra* at 4 & n. 5, $8,525.00 was disbursed to the City of Philadelphia for water revenue collection, $6,047.01 was disbursed to the City of Phila-

delphia for taxes, $1,398.70 was disbursed to PGW and $36.83 was disbursed to Advantage Credit.

Debtor cites no case law in support of her contention that, because BankOne failed to fulfill its obligations under § 1635(b), she should be relieved of her "tender obligation" under that provision. *See* Debtor's Post–Trial Brief at 10. My research reveals that although some courts have recognized that such a remedy may be imposed under § 1635(b), it is viewed as a harsh one and therefore to be confined to "situations where creditors have tried to deceive or cheat the consumer." *Michel v. Beneficial Consumer Discount Co. (In re Michel)*, 140 B.R. 92, 101 (Bankr.E.D.Pa. 1992) (refusing to allow debtors to eliminate debt where creditor had "committed substantial TILA violations" but no "serious overreaching or improper conduct"). *See also Shepeard v. Quality Siding & Window Factory*, 730 F.Supp. 1295, 1306–07 (D.Del.1990) (ruling that if a "creditor does not properly respond to the consumer's notice of rescission," the consumer's obligation to the creditor can be eliminated but noting that "courts have avoided such a harsh result when there is no evidence that the creditor tried to cheat or deceive the consumer."). I need not decide whether or under what circumstance release of the debt is an available remedy under § 1635(b) [22] since there is no evidence in the record before me that Aames or BankOne tried to deceive or cheat the Williams. Consequently, I find no merit in Debtor's contention that she should be relieved of her tender obligation.

### (ii) *Whether Rescission can be Conditioned Upon Tender by the Debtor*

When an obligor exercises his or her right to rescind under § 1635(a), "any security interest given by the obligor ... becomes void[.]" 15 U.S.C. § 1635(b). Based on this provision, Debtor contends an order should be entered declaring BankOne's security interest void. However, as noted above, BankOne argues that rescission should be conditioned upon Debtor's tender of the remaining principal due under the Loan.

BankOne's argument is supported by the clear majority of circuit courts that have addressed the issue. *See Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140–42 (11th Cir.1992); *Federal Deposit Insurance Corporation v. Hughes Development Company*, 938 F.2d 889, 890 (8th Cir.1991); *Brown v. National Permanent Savings and Loan Association*, 683 F.2d 444 (D.C.Cir.1982); *Rudisell v. Fifth*

---

**22.** An argument can be made, based on the statute, that the only remedy available to an obligor when a creditor fails to fulfill its duties under § 1635(b) is statutory damages under § 1640(a). While § 1635(b) specifically provides that when an obligor tenders property to the creditor and it does not take possession of the property within 20 days, "ownership of the property vests in the obligor" and he or she has no further obligation to pay for it, the statute does not provide that an obligor is relieved of his or her tender obligation when the creditor fails to fulfill its obligations to return money to the obligor or take action to reflect the termination of its security interest. *See Quenzer v. Advanta Mortgage Corp., USA (In re Quenzer)*, 274 B.R. 899 (Bankr.D.Kan.2001), *rev'd on other grounds*, 288 B.R. 884 (D.Kan.2003); *see also*

*Rudisell v. Fifth Third Bank*, 622 F.2d 243, (6th Cir.1980) (rejecting obligor's argument that it should be relieved of tender obligation since creditor failed to act based on reasoning that while § 1635(b) "contemplates the creditor tendering first," it requires the debtor to tender upon the creditor fulfilling its obligations); *Mayfield v. Vanguard Savings & Loan Association*, 710 F.Supp. 143, 147 (E.D.Pa.1989) (citing cases holding that "the consumer must tender or offer to tender the proceeds of the consumer transaction before finding a forfeiture"). Based on this observation of the statute, the bankruptcy court in *Quenzer, supra,* noted that "[i]t may be that a civil penalty under § 1640(a) is the only remedy Congress intended for the latter situation [when the creditor fails to fulfill its obligations]." 274 B.R. at 904.

*Third Bank,* 622 F.2d 243, 254 (6th Cir. 1980); *Powers v. Sims and Levin (In re Powers),* 542 F.2d 1216, 1221–22 (4th Cir. 1976);[23] *LaGrone v. Johnson,* 534 F.2d 1360, 1362 (9th Cir.1976). Only the Fifth Circuit Court of Appeals holds otherwise. *Gerasta v. Hibernia National Bank,* 575 F.2d 580, 584–85 (5th Cir.1978) (ruling that while the creditor was entitled to a return of the loan proceeds, the debt was no longer secured by a mortgage on the obligors' property and the creditor's duties were in "no way conditional" upon the obligors' "tender of the loan proceeds."). *See also Harris v. Tower of Loan of Mississippi, Inc.,* 609 F.2d 120, 123 (5th Cir. 1980) (observing that *Gerasta v. Hibernia National Bank,* 575 F.2d 580 (5th Cir. 1978), foreclosed the "argument that the creditors duties are conditioned upon tender by the obligor.") The Third Circuit Court of Appeals has not spoken on this subject. However, in *Apaydin v. Citibank Federal Savings Bank (In re Apaydin),* 201 B.R. 716, 723–24 (Bankr.E.D.Pa.1996), my colleague Bankruptcy Judge Steven Raslavich conditioned rescission on tender as urged by BankOne here. This view has also been accepted in the Tenth Circuit where a bankruptcy court decision refusing to condition rescission was reversed by the district court in *Quenzer v. Advanta*

*Mortgage Corporation, USA,* 288 B.R. 884, 886–89 (D.Kan.2003).

The primary rationale underlying the circuit court decisions allowing conditional rescission is that rescission is an equitable remedy and that while TILA may have granted obligors the remedy of rescission, "application of the remedy is [still] governed by equitable principles." *Brown v. National Permanent Federal Savings and Loan Association, supra,* 683 F.2d at 449. *See also Rudisell v. Fifth Third Bank, supra,* 622 F.2d at 254; *Powers v. Sims and Levin, supra,* 542 F.2d at 1221; *Palmer v. Wilson, supra,* 502 F.2d at 862. These courts focus on the fact that one of the goals of statutory rescission is to "return the parties most nearly to the position they held prior to entering into the transaction." *E.g., Williams v. Homestake Mortgage Co., supra,* 968 F.2d at 1140. They find support for their authority to condition rescission on the obligor's compliance with his or her tender obligations in the last sentence of § 1635(b) which states that "[t]he procedures prescribed by this section shall apply except when otherwise ordered by a court[.]" 15 U.S.C. § 1635(b). *See Williams v. Homestake Mortgage Co., supra,* 968 F.2d at 1142; *Federal Deposit Insurance Corporation v. Hughes Development Company, supra,* 938 F.2d at 890.[24] They reason that the

---

**23.** In *Powers v. Sims and Levin, supra,* the obligors obtained a loan to make home improvements and to satisfy certain debts which they had to third parties. 542 F.2d at 1218. In attempting to rescind the loan transaction, they stated that they would tender delivery of the home improvements but not reimburse the creditor for the money that was used to satisfy debts to third parties. *Id.* at 1220. The Fourth Circuit Court of Appeals viewed this as an anticipatory breach by the obligors of their obligation to make full restitution to the creditor. *Id.* at 1221. The Fourth Circuit ruled that it could, by "exercising traditional equity powers, . . . condition the borrowers' continuing right of rescission upon their tender to the lender of all of the funds spent by

the lender in discharging the earlier indebtedness of the borrowers as well as the value of the home improvements." *Id.* at 1221–22.

**24.** In *Semar v. Platte Valley Federal Savings & Loan Association,* 791 F.2d 699, 706 n. 15 (9th Cir.1986), the Ninth Circuit noted that the 1980 amendment to § 1635(b) which added the sentence quoted above provides courts with the statutory authority to alter the procedures in § 1635(b) so that they no longer need to rely upon their equitable powers to do so. Indeed some courts have found that the addition of the last sentence to § 1635(b) in the Truth in Lending Simplification and Reform Act of 1980 expressed Congress' intent

term "procedures" includes the voiding of a creditor's security interest referenced in the first sentence of § 1635(b).

Notably none of the circuit court decisions arose in a bankruptcy context. Yet the conditional rescission remedy has been embraced in some bankruptcy cases on equitable grounds, the courts finding that failure to do so would be contrary to the equitable purpose of the rescission remedy. The rationale is that, without conditioning rescission, the creditor will suffer an unduly harsh or inequitable result as its secured claim would be relegated to unsecured status in the bankruptcy case. *See Quenzer v. Advanta Mortgage Corporation, USA, supra,* 288 B.R. at 889 ("Even though defendant violated TILA, automatically relegating its entire claim to unsecured status under these circumstances would be completely inequitable and would exact a penalty entirely disproportionate to its offense."); *Apaydin v. Citibank Federal Savings Bank (In re Apaydin), supra,*

201 B.R. at 724 ("Even though the defendants engaged in flagrant violations of TILA, automatically relegating their entire claim to unsecured status would be an utterly disproportionate and completely inequitable penalty[.]"); *Wepsic v. Josephson (In re Wepsic), supra,* 231 B.R. at 776 (rejecting debtor's proposal to treat creditor's claim as unsecured and pay over the course of three or more years as contrary to rescission's purpose to return parties to status quo ante);[25] *Lynch v. GMAC Mortgage Corporation,* 170 B.R. 26, 30 (Bankr. D.N.H.1994) (concluding that voiding of lien and relegating creditor to unsecured status would allow debtor to pay the creditor only a small fraction of its claim under the chapter 13 plan, a consequence that Congress could not have contemplated).[26]

I am not persuaded by the cases holding that courts may condition rescission under § 1635 on payment by the obligor. The language of § 1635(b) and Regulation Z as supported by the legislative history to

---

to allow courts to impose equitable conditions at any time during the rescission process to ensure that an obligor satisfies his or her tender obligation. *See Williams v. Homestake Mortgage Co., supra,* 968 F.2d at 1142 (*quoting* S.Rep. No. 368, 96th Cong., 2d Sess. 29 (1980) (emphasis added), *reprinted in* 1980 U.S.C.C.A.N. 236, 265) ("Congress, through its legislative history, has made it quite clear that 'the courts, *at any time during the rescission process,* may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act.' "); *Quenzer v. Advanta Mortgage Corporation, USA, supra,* 288 B.R. at 888 (concluding that legislative history confirms that Congress intended the courts to have authority to impose equitable conditions at any time during the rescission process to insure that the consumer complies with his or her obligations under TILA).

**25.** The *Wepsic* court, explained its reasoning as follows:

Debtor has no unsecured creditors (other than [the defendant] ) and has indicated her

property is worth between $1.3 and $1.6 million leaving her with over $500,000 in equity. Wepsic has clearly demonstrated the tendency to default on her installment obligations.

\* \* \* \* \* \*

If [the defendant's] security interest is voided, [the debtor] could easily default under her Chapter 13 case and allow the case to be dismissed. Once free from the jurisdiction of the bankruptcy court, [the debtor] could sell her home, pocket approximately $93,000 additional equity which is the amount of [the creditor's] secured claim, and leave [the defendant] to seek her collection remedies outside of this Court. This result is clearly inequitable given that [the debtor] has considerable equity in her home and no other unsecured creditors.
231 B.R. at 776.

**26.** This court utilized not only § 1635(b) of TILA but Code § 105 to affirmatively grant the creditor a continuing security interest to secure its claim as reduced by TILA recoupment or setoffs.

§ 1635(b) informs that, while courts can modify the procedures set forth in § 1635(b), they cannot modify the voiding of a creditor's security interest. As the Eleventh Circuit recognized in *Williams, supra,* "the sequence of rescission and tender set forth in § 1635(b) is a reordering of the common law rules governing rescission." 968 F.2d at 1140. Explaining the difference between the common law rules governing rescission and rescission under TILA, the Eleventh Circuit stated:

> Under common law rescission, the rescinding party must first tender the property that he has received under the agreement before the contract may be considered void. 17A Am.Jur.2d Contracts § 590, at 600–01 (1991). Once the rescinding party has performed his obligations, the contract becomes void and the rescinding party may then bring an action in replevin or assumpsit to insure that the non-rescinding party will restore him to the position that he was in prior to entering into the agreement, *i.e.,* return earnest money or monthly payments and void all security interests. *Id.* § 604, at 610–13. Under § 1635(b), however, all that the consumer need do is notify the creditor of his intent to rescind. The agreement is then automatically rescinded and the creditor must, ordinarily, tender first. Thus, rescission under § 1635 "place[s] the consumer in a much stronger bargaining position than he enjoys under the traditional rules of rescission." Note, Truth–in–Lending: Judicial Modification of the Right of Rescission, 1974 Duke L.J. 1227, 1234 (1974).

968 F.2d at 1140. In deviating in § 1635(b) from the traditional common law rules of rescission, Congress enacted a rescission scheme particular to TILA which provides consumers with stronger rights than they would have under common law rescission. There is nothing to suggest that Congress acted other than intentionally in fashioning rescission in this manner. *See South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 351, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (*quoting Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990)) ("We assume that Congress is aware of existing law when it passes legislation."); *United States v. Phillips,* 19 F.3d 1565, 1581 (11th Cir.1994) ("Congress is presumed to be knowledgeable about existing case law pertinent to any legislation it enacts."). Congress must have certainly been aware when it chose to alter the common law rules of rescission by providing for the voiding of a creditor's security interest before the obligor has tendered what he or she owes to the creditor that it would put the creditor at risk because the obligor may refuse to perform or might be financially unable to do so. *See Palmer v. Wilson, supra,* 502 F.2d at 864 (Wright, J., concurring and dissenting in part) (observing that "the possibility that the principal debt will be uncollectible is a common circumstance in cases of this sort. It is hardly an unusual situation where we might infer Congress did not intend the result."). Since Congress must have been aware of this risk when it enacted the statutory scheme set forth in § 1635(b), that part of the rescission scheme which provides for the voiding of a creditor's security interest before the obligor has made payment should be applied as written unless Congress has specifically indicated that courts have the authority to modify it.

The last sentence of § 1635(b) provides: "The procedures prescribed by this subsection shall apply except where otherwise ordered by a court." As noted above, courts have interpreted the term "procedures" to include the voiding of a creditor's security interest. However, the term

"procedure" as defined by Black's Law Dictionary is "[t]he mode of proceeding by which a legal right is enforced, as distinguished from the substantive law which gives or defines the right, and which, by means of the proceeding, the court is to administer." Black's Law Dictionary 1203–04 (6th ed.1990). Similarly, according to Merriam Webster's Collegiate Dictionary, "procedure" means "a particular way of accomplishing something or of acting" and "a step in a procedure." Merriam Webster's Collegiate Dictionary 929 (10th ed.1995). As § 1635(b) is written, when an obligor exercises his right to rescind, the obligor is relieved of the obligation to pay any finance or other charge associated with the loan transaction and any security interest given by an obligor becomes void upon rescission. No steps or procedures are required or needed to effect these results; they occur upon rescission by operation of law, namely by operation of § 1635(b) and, as such, are substantive rights granted by the statute. *See Semar v. Platte Valley Federal Savings & Loan Association,* 791 F.2d 699, 705–06 & n. 15 (9th Cir.1986) (rejecting argument that district court had equitable discretion to modify § 1635(b) by making obligors liable for interest on loan transaction reasoning that the provision in § 1635(b) which states that a borrower or obligor "is not liable for any finance or other charge" is a substantive provision). In contrast, § 1635(b) sets forth certain steps, duties or procedures which must be followed or performed after rescission has occurred to accomplish the process. These steps are set forth in the second to fifth sentences of § 1635(b) and include, for example, the creditor's duty to return money or property given by the obligor as earnest money or a downpayment and the creditor's obligation to take action to reflect the termination of its security interest.

The aforementioned interpretation of § 1635(b) is directly supported by § 226.23(d) of Regulation Z which states:

(d) Effects of rescission.

(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4) **The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.**

12 C.F.R. § 226.23(d) (emphasis added). As clearly and indisputably set forth in subsection (d)(4), the procedures from the rescission scheme which may be modified by court order are contained in (d)(2) and

(d)(3) and do not include the voiding of the creditor's security interest or the elimination of liability on the part of the obligor for any finance charge. *See Celona v. Equitable National Bank,* 98 B.R. 705, 708 (E.D.Pa.1989) (ruling that since § 226.23(d) of Regulation Z "specifies that only 'procedures outlined in paragraphs (d)(2) and (3) of this Section may be modified by court order,'" that the bankruptcy court "properly found that it lacked the equitable discretion to condition the voiding of the security interest or cancellation of the finance charges."). Consequently, cases which interpret § 1635(b) as allowing conditional rescission, which conditions the voiding of a creditor's security interest upon tender by the obligor, appear to be plainly inconsistent with 12 C.F.R. § 226.23(d). *See Whitley v. Rhodes Financial Services, Inc. (In re Whitley),* 177 B.R. 142, 152 (Bankr.D.Mass.1995) (concluding that courts following the reasoning in *Williams v. Homestake Mortgage Co.,* *supra,* to impose conditional rescission "reject the import of Regulation Z to the extent that it purports to limit the discretion courts have to condition or modify the effect of a customer's notice of rescission, namely the voiding of any security interest.").

The Supreme Court has specifically held that, unless irrational or repugnant to the statute, the Federal Reserve Board's lawmaking is to be upheld. None of the cases cited above in favor of conditional rescission have held that § 226.23(d)(4) is irrational or repugnant to § 1635(b). Indeed, since Congress specifically reordered the common law rules of rescission when it enacted § 1635(b) so that a creditor's security interest is voided before tender by an obligee, I do not see how the Federal Reserve Board's regulation which upholds this reordering of the common law rules as Congress did in § 1635(b) could be viewed as irrational or repugnant to the statute.

The Federal Reserve Board's regulation allows courts to modify some aspects of the rescission procedure but does not allow courts to tamper with Congress' determination that upon rescission a creditor's security interest should be immediately voided and that such voiding should not be dependent upon tender by the obligor. Consequently, unless amended by the Federal Reserve Board, § 226.23(d)(4) should be applied as the Supreme Court has directed.

To the extent legislative history of the Truth in Lending and Simplification and Reform Act is relevant given the plain language of the statute, it refutes rather than supports the court's ability to condition the voiding of a creditor's security interest on the debtor's tender. I thus respectfully disagree with the Eleventh Circuit's view in *Williams* that legislative history evidences Congress clear intent to allow courts to modify the voidance obligation. *See* n. 24 *supra.* The legislative history for § 1635(b) states, in relevant part:

> Upon application by the consumer or the creditor, a court is authorized to modify this section's procedures where appropriate. For example, a court might use this discretion in a situation where a consumer in bankruptcy or wage earner proceeding is prohibited from returning the property. The committee expects that the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required under the act.

S. Rep. 96–368, 96th Cong., 1st Sess. 29 (1979), 1979 WL 10375 (Leg.Hist.), *reprinted in* 1980 U.S.C.C.A.N. 236, 264–65. While this passage authorizes courts to use their equitable power "at any time during the rescission process," it specifically

states that such power is to be used to "insure that the consumer meets his obligations *after* the creditor has performed his obligations as required under the Act." Since conditional rescission requires the consumer/obligor to act before the creditor's security interest is voided, it does not "insure that the consumer meets his obligations *after* the creditor has performed his obligations." Thus, the legislative history to § 1635(b) does not support, or at least does not provide a "clear" indication, that Congress intended for courts to modify § 1635(b) by imposing conditional rescission.

■ Absent the statutory authority to condition the legal entitlement to rescission, a court may not fashion such a remedy even to avoid a seemingly inequitable result. Courts are not permitted to ignore or bend the law to mitigate or avoid a harsh result. Rather it is up to Congress to amend the law. *Neal v. United States,* 516 U.S. 284, 296, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996) (observing that Congress and not the courts have the responsibility for revising its statutes); *In re Barshak,* 106 F.3d 501, 506 (3d Cir.1997), *affirming* 185 B.R. 210, 213 (Bankr. E.D.Pa.1995) ("We are not free to ignore the clear language of a Pennsylvania statute merely because by rewriting the statute we arguably would act consistently with a legislative policy."); *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1556–57 (10th Cir.1994) (reasoning that while considerations of fairness may motivate Congress to amend a statute, they do not "permit the courts to disregard the clear language of a statute.").

■ While I have expressed my disagreement with those courts which have found authority to order conditional rescission, I would not choose to exercise such authority in this bankruptcy case even if

such authority should exist. In *Williams v. Gelt Financial Corporation,* 237 B.R. 590, 598 (E.D.Pa.1999), the district court affirmed the decision of the bankruptcy court not to impose conditional rescission stating "[w]hile several courts have conditioned the creditor's duty to satisfy the lien of record on the obligor's prior tender of the original principal amount of the loan, none suggests that there is a requirement to do so." *See also Whitley v. Rhodes Financial Services, Inc. (In re Whitley),* 177 B.R. 142, 152 (Bankr. D.Mass.1995) (court need not decide whether it lacks the ability to condition rescission on a customer's tender because in this case the Court chooses not to do so but rather to follow *In re Myers,* 175 B.R. 122, 128 (Bankr.D.Mass.1994), which held that "rescission by an obligor is not conditioned by tender or payment in the context of a bankruptcy case.").

The underlying premise of the circuit authority which supports conditional rescission is that equity demands this remedy. Equitable considerations are quite different in a non-bankruptcy setting than in the bankruptcy context where state law rights and remedies are altered. The Court in *Celona v. Equitable National Bank,* 98 B.R. 705 (E.D.Pa.1989), recognized that while there might be some validity to conditioning rescission on tender in a non-bankruptcy context, that validity was lost and the conditioning was inappropriate in bankruptcy cases. *Id.* at 707. Quoting from *In re Piercy,* 18 B.R. 1004, 1007 (Bankr.W.D.Ky.1982), it reiterated:

> In a non-bankruptcy setting, the rights and duties of the parties upon TILA rescission are clear and absolute. Each party must make the other as whole as he would have been had the contract never been entered into. In the absence of bankruptcy, there is no legal impediment to either party doing what is re-

quired to restore the status quo ante. Consequently, the creditor's statutory duty to perform first merely establishes the order of performance; it does not alter the ultimate effect on the remedy. 98 B.R. at 707. In bankruptcy, Debtor has the right to satisfy claims over the life of her Chapter 13 plan. Conditioning rescission on repayment thus extracts a price— *i.e.*, the loss of this statutorily granted bankruptcy right. While every other unsecured creditor's ability to collect is modified by the bankruptcy law, the TILA violator would be insulated under BankOne's theory.

I conclude that it is possible to fashion a remedy that does not require a debtor to forgo the statutory rights conferred by the Bankruptcy Code in order to fulfill her duty to tender payment to the creditor after its lien has been voided. Thus, while I refuse to condition rescission on tender of payment, I will prescribe the procedures by which BankOne's claim shall be treated in this bankruptcy case to ensure that Debtor satisfies her tender obligation to the extent to which she is legally obligated. In so doing, the legislative objectives of both federal statutes are harmonized, *i.e.*, the parties are brought to the status quo ante consistent with § 1635(b) and § 226.23(d) and the Debtor does not forfeit her bankruptcy rights. To this end, I shall order the Debtor to file an amended plan that classifies BankOne's unsecured claim separately and provides for the amount I have now liquidated, *i.e.*, $9,574.74, in full over the remaining plan life.[27] I find no unfairness from relegating BankOne to unsecured status as that is the precise consequence Congress intended by

§ 1635(b). The unfairness arises only if bankruptcy is utilized to permit payment of anything less than the full amount of the claim. The fact that full payment may be deferred while the Debtor is under court protection is a consequence of bankruptcy and not an inequitable result. BankOne's unsecured claim of $9,274.72 will be memorialized in a judgment and the stay will be modified for the limited purpose of allowing BankOne to record it as protection against potential future creditors of the Debtor.

Absent a plan providing for the payment of BankOne's claim as so noted, confirmation will elude this Debtor. If confirmation cannot be secured in the time frame set forth below, this case will be dismissed. BankOne will then be free of the automatic stay and may exercise its state court remedies in connection with its judgment. These procedures, in my view, are consistent with TILA's regulatory scheme while ameliorating the potential of an inequitable result to BankOne.

### (iii) *Whether BankOne is Obligated to Return Any Money or Property to Debtor under § 1635(b)*

Relying upon § 1635(b), Debtor contends that BankOne should be required to return to her "all monies paid in connection with the credit transaction" which she asserts includes the $3,862.38 paid in settlement charges and the ten monthly payments she made of $257.53 each. I disagree.

First, Debtor did not pay the settlement charges on the Loan; she financed them. Consequently, the settlement

---

27. A plan may designate classes of unsecured claims provided it does not discriminate unfairly against any class so designated. 11 U.S.C. § 1322(b)(1). BankOne's claim is different than other unsecured claims as it arises as a statutory entitlement according BankOne

full payment in connection with the rescission of the Loan. The voiding of BankOne's lien gave rise to that liquidated claim which may be deferred in payment over the life of the plan but must nonetheless be satisfied in full consistent with the TILA.

charges do not constitute monies "paid in connection with the credit transaction."

▆▆ Secondly, although Debtor made monthly payments to BankOne on the Loan, the obligation of a creditor to return property or money to an obligor under § 1635(b) is a "procedure" which I have authority to modify. *See* 12 C.F.R. § 226.23(d)(4). *See also Quenzer v. Advanta Mortgage Corp. USA, supra,* 274 B.R. at 904 (setting off amount which debtor paid for closing costs, fees and payments on loan from amount which debtors were required to return to creditor on loan). I shall exercise my equitable discretion to allow BankOne to setoff Debtor's loan payments against the principal balance that BankOne is owed. Contrary to Debtor's assertion, the record reveals that she made nine (rather than ten) payments on the Loan; these nine payments total $2,317.77. Subtracting this amount from the principal balance of the Loan which is $16,287.62 leaves a remainder of $13,969.85 owed by Debtor on the Loan.

### B. *Statutory Damages*

Debtor contends that she is entitled to the following statutory damages: (i) $2,000 in damages by recoupment for BankOne's disclosure violations; (ii) $2,000 in affirmative damages for BankOne's failure to rescind the transaction; and (iii) $6,437.68 in affirmative damages for BankOne's HOEPA violation.

#### (i) *Statutory Damages for Disclosure Violations*

▆▆ · Under 15 U.S.C. § 1640(a)(2)(A)(iii), statutory damages of "not less than $200 or greater than $2,000"

may be awarded to Debtor for the TILA disclosure violations discussed above. Since the violations consist of failing to provide Debtor with her own copies of the Notice of Right to Cancel, the Disclosure Statement and the pre-closing HOEPA disclosures which are basic requirements of TILA,[28] I shall award the full amount of statutory damages to which Debtor is entitled which is $2,000. Since this adversary action was commenced more than one year after the date of the violations, *see* 15 U.S.C. § 1640(e), the damages shall be awarded by way of recoupment as Debtor has requested which means that the balance on the Loan is decreased from $13,969.85 to $11,969.85.

#### (ii) *Statutory Damages for Failure to Rescind*

▆▆ Debtor argues that she is also entitled to an award of statutory damages for BankOne's failure to honor her notice of rescission. She is correct. "The failure to honor a consumer's rescission of her loan is a separate violation of the TILA." *Staley v. Americorp Credit Corp.,* 164 F.Supp.2d 578, 584 (D.Md.2001). "Although subsection (g) clearly limits obligors to one recovery for multiple disclosure violations ... Congress is certainly aware of the difference between disclosure violations and rescission violations." *Aquino v. Public Finance Consumer Discount Company,* 606 F.Supp. 504, 510 (E.D.Pa.1985). *See also Williams v. Gelt Financial Corporation,* 237 B.R. 590, 599–600 (E.D.Pa.1999) (ruling that damages may be awarded both for the creditor's failure "to make the required disclosures" and "for its failure to respond

---

**28.** As I noted above, BankOne's argument that Aames was only required to provide the Williams with one shared copy of the pre-closing HOEPA disclosures is inconsistent with the law. Since I presume that BankOne was acting within the bounds of ethical advo-

cacy in making its argument, I can only conclude that it has been engaging in loan transactions without knowledge of one of the basic requirements regarding pre-closing HOEPA disclosures.

properly to [the debtor's] rescission."); *Mayfield v. Vanguard Savings & Loan Association,* 710 F.Supp. 143, 146 (E.D.Pa. 1989) (while multiple disclosure violations made in connection with a single loan transaction entitle a consumer to only a single recovery, the consumer is also entitled to an additional award of damages under § 1640 if the consumer rightfully exercised her right to rescind and the creditor failed to comply with its obligations); *Moore v. Mid–Penn Consumer Discount Co. (In re Moore),* 117 B.R. 135, 141–42 (Bankr.E.D.Pa.1990) (Scholl, J.) (concluding that, in addition to a claim of recoupment for statutory damages based on the creditor's disclosure violation under the TILA, the debtor was entitled to recover a statutory penalty for the creditor's failure to respond to rescission notice), *aff'd,* 1991 WL 146241 (E.D.Pa. July 25, 1991); *Steinbrecher v. Mid–Penn Consumer Discount Co. (In re Steinbrecher),* 110 B.R. 155, 166 (Bankr.E.D.Pa.1990) (Fox, J.) (awarding separate statutory damages for TILA violation and failure to rescind loan transaction).

■ Debtor shall be awarded $200 for BankOne's failure to honor her Rescission Notice. I refrain from awarding a larger amount of damages because Debtor's Rescission Notice failed to specifically apprise BankOne of the grounds for rescission. Moreover, based on the evidence in the record, BankOne could not have ascertained from the Loan documents in its possession whether Debtor had valid grounds to rescind the Loan transaction. Consequently, it was hampered in its ability to evaluate or conduct an investigation into the validity of Debtor's request for rescission. Had Debtor specifically stated in her Rescission Notice that she did not receive copies of the notice of the right to rescind or a copy of the Disclosure Statement or pre-closing HOEPA disclosures,

BankOne would have been in a much better position to determine the validity of Debtor's claims and, thus, evaluate how to proceed.

Exercising my equitable discretion, I shall also permit BankOne to setoff this $200 statutory award from the balance which Debtor owes on the Loan which reduces the balance from $11,969.85 to $11,769.85.

### (iii) *Statutory Damages for HOEPA Violation*

The statutory damage provision contained in § 1640(a) was amended to increase the total award to the consumer in the case of HOEPA violations. *See* 15 U.S.C. § 1640(a)(4). Besides the standard TILA penalty, the consumer "may also recover an amount equal to the total finance charges and fees paid." *Newton v. United Companies Financial Corp., supra,* 24 F.Supp.2d at 451 (*citing* 15 U.S.C. § 1640(a)(4)).

■ Since Debtor financed the settlement charges for the Loan, she did not pay any fees for the Loan. However, she made nine monthly payments to BankOne totaling $2,317.77 of which $2,195.11 went to paying interest. Consequently, she is entitled to an award of $2,195.11 for the failure to comply with 15 U.S.C. § 1639. This amount will similarly be deducted from the balance she owes to BankOne on the Loan which decreases that amount from $11,769.85 to $9,574.74.

### C. *Attorney's Fees and Costs*

■ Pursuant to 15 U.S.C. § 1640(a)(3), Debtor seeks to recover the costs of this action together with a reasonable attorney's fee. Having successfully litigated this action, she is entitled to such relief.

An Order consistent with this Opinion shall be entered.

## ORDER

**AND NOW,** this 3rd day of April 2003, upon consideration of the Complaint filed by plaintiff/debtor, Maryetta Williams ("Debtor"), against defendant BankOne National Association ("BankOne"), and after trial with notice, and for the reasons stated in the attached Opinion, it is hereby **ORDERED** that:

1. Judgment is entered in favor of the Debtor and against BankOne.

2. The mortgage which Debtor and her former husband granted to BankOne on their residence at 3219 W. Dakota Street in Philadelphia, Pennsylvania in connection with the loan transaction of November 13, 1999 is void. BankOne has twenty days from the date of this Order, until April 24, 2003, to take any action necessary to reflect the termination of the aforementioned mortgage. Within thirty days of the date of this Order or by May 5, 2003, BankOne shall deliver to Debtor a copy of all documents reflecting the termination of the aforementioned mortgage.

3. An unsecured claim of BankOne against the Debtor's estate is allowed in the amount of $9,574.74 and will be treated in an amended plan to be filed by **April 16, 2003** which provides for payments to the Chapter 13 trustee over the remaining life of the plan equal to the full amount of the claim. The plan shall be supported by an amended and verified Schedule I and J. Confirmation of such plan will be held on **May 22, 2003 at 9:30 a.m.** in the Robert N.C. Nix, Sr. Federal Courthouse, 2nd floor, 900 Market Street, Courtroom # 3, Philadelphia, PA. No continuances shall be granted absent extraordinary circumstances.

4. Debtor's obligation to BankOne in the amount of $9,574.74 may be recorded as a judgment. The automatic stay of § 362(a) is lifted for that limited purpose.

5. Debtor is entitled to "the costs of the action, together with a reasonable attorney's fee" pursuant to 15 U.S.C. § 1640(a)(3). Debtor's counsel shall, within thirty days (30) of the date of this Order, file with the Clerk of Court and serve upon opposing counsel an application, in accordance with Local Bankruptcy Rule 2016–3 for approval of such costs and attorney's fee. BankOne shall have ten (10) days thereafter to file an objection to the application. If an objection is timely filed, then the application shall be scheduled for hearing. If no objection is filed, then the application shall be ruled upon without a hearing pursuant to applicable decisional law in this Circuit. *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833 (3d Cir. 1994).